IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

UNITED STATES OF AMERICA                          PLAINTIFF/RESPONDENT

            v.                      Civil No. 04-4030
                          Criminal No. 4:01cr40019-001

BRIAN L. BROWN                                      DEFENDANT/MOVANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS

Movant, Brian L. Brown, an inmate at the United States Prison (hereinafter "USP"), Florence,
Colorado, proceeds under *28 U.S.C. § 2255*, seeking to vacate, set aside or correct his sentence. By
order entered on January 26, 2005, the Federal Defender was appointed as attorney for Movant, and
Assistant Federal Defender Jack Schisler has represented Movant herein. (Doc. #154)

Evidentiary hearing on the pending motion was conducted on September 7 and 22, 2005. At
the conclusion of the hearing, the issues in this case were taken under advisement pending the
submission of post-hearing briefs. These briefs have now been submitted and the matter is ready for
decision.

### Procedural and Factual Background:

On November 29, 2001, an indictment was filed in this court charging Brown with
kidnapping and aggravated sexual abuse of a child, in violation of *18 U.S.C. §§ 1201(a)(1)* and
*2241(c)*. (Doc. #8) Brown was arraigned on December 6, 2001. (Doc. #9) Attorney Craig Henry
was appointed as Brown's attorney. (Docs. #5 & #10)

On February 28, 2002, Brown filed a motion to relieve Attorney Henry. (Doc. #34) On
March 6, 2002, Brown filed a motion seeking permission to proceed without an attorney. (Doc. #36)

The motions were granted after a hearing conducted on March 7, 2002. (Doc. #40) The court found that Brown knowingly and voluntarily waived counsel. (Docs. #40 & #42) On March 8, 2002, Attorney Steve Harrelson was appointed to serve as standby counsel. (Doc. #43)

At the March 7, 2002 hearing, the court also granted Brown's oral request for access to a law library and ordered that Brown be transferred from the Bi-State Detention Center to the FCI Texarkana through the conclusion of trial, and that Brown be afforded access to the FCI law library, computer/word processing equipment for at least four hours per day, three days per week for trial preparation purposes. These orders were entered on March 11, 2002. (Docs. #45 & #49)

On March 8, 2002, the United States filed a motion seeking authorization for the alleged child-victim to testify by two-way closed circuit television. (Doc. #41) The court set hearing on this motion for March 18, 2002, at 8:00 a.m., immediately before the commencement of the trial. (Doc. #44) After hearing, the motion was granted. (Doc. #57)

Jury trial was conducted on March 18-22, 2002. Brown was convicted of both charges. (Doc. #64) Brown's post-trial motions were denied. (Doc. #77)

On June 4, 2002, Brown filed a motion for appointment of counsel, and on June 7, 2002, the court entered an order granting this motion and expanding the role of Attorney Steve Harrelson from standby counsel to that of attorney of record. (Doc. #80)

Brown was sentenced on June 24, 2002, to concurrent terms of life in prison. (Doc. #87)

By order entered on June 25, 2002, upon Brown's oral motion, Steve Harrelson was relieved as Brown's attorney and Jeff Harrelson was substituted as attorney of record. (Doc. #90)

Brown appealed asserting the following claims:

a. that this court violated the Religious Freedom Restoration Act (RFRA), *42*

-2-

*U.S.C. § 2000bb-1* and the Free Exercise Clause of the First Amendment by granting the government's motion for an involuntary blood sample for DNA testing;

    b.    that the verdict form constructively amended the aggravated sexual abuse count in the indictment;

    c.    that the government's proof at trial created two material variances from the indictment;

    d.    that his conduct fell within the parental exception to the federal kidnapping offense; and,

    e.    that this court committed sentencing errors.

*United States v. Brown*, 330 F.3d 1073, 1076 (8th Cir. 2003)

The United States Court of Appeals for the Eighth Circuit affirmed the convictions and sentences. *Id.*

**Pending Motion:**

Brown filed his original motion to vacate, set aside or correct sentence, pro se on February 23, 2004. (Doc. #106) Since that time, he has filed several additional pleadings purporting to amend his motion and asserting a plethora of additional claims. (Docs. #114, #115, 121, 129, 132, 159) Because Brown had asserted a variety of claims in "shotgun" fashion, after counsel was appointed, this court ordered that Brown set forth all of the claims and grounds for relief asserted in a single amended motion. (Doc. #156) Such an amended motion was filed. (Doc. #159) Believing that the amended motion (Doc. #159), may not have included all of the claims which Brown wished to assert, the undersigned, by order entered on June 20, 2005, directed Brown to file, through counsel, a pre-hearing memorandum setting forth all of his claims. (Doc. #167) The pre-hearing memorandum was filed on August 5, 2005. (Doc. #172) Further, following the hearing Brown filed a post-hearing brief

AO72A
(Rev. 8/82)

listing his claims. (Doc. #184)   The claims now asserted are:

a.   Sentencing enhancements were imposed in violation of Sixth Amendment rights; failure to place before jury;

b.   The indictment should have been dismissed pursuant to the Speedy Trial Act as the trial commenced less than 30 days from the date Brown elected to represent himself;

c.   Brown's Constitutional rights under the Confrontation Clause were violated by allowing the complaining witness to testify by way of closed circuit televison;

d.   The convictions were obtained in violation of the Speedy Trial Act, specifically *18 U.S.C. § 3161(b)*, for failure to indict within 30 days of Brown's arrest;

e.   The convictions were obtained in violation of the protection against "Double Jeopardy;"

f.   The convictions were obtained through unconstitutional search and seizure;

g.   The convictions were obtained by unconstitutional failure of the government to disclose evidence exculpatory in nature;

h.   The convictions were obtained by the unconstitutional and statutory rules that prohibit charging a person with an individual having, "legal custody" of the alleged victim pursuant to *18 U.S.C. § 1201(g)(1)(B)(ii)(VII)*;

i.   Brown received the ineffective assistance of counsel;

j.   DNA evidence was improperly admitted which contributed to a conviction in violation of the Constitution.

(Doc. #184)

## **Discussion:**

_____"This proceeding is brought under *28 U.S.C. § 2255*, the statutory analogue for habeas corpus for persons in federal custody.  This statute provides a remedy in the sentencing court (as opposed to habeas corpus, which lies in the district of confinement) for claims that a sentence was 'imposed

-4-

in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.'" *Poor Thunder v. United States*, 810 F.2d 817, 821 (8th Cir. 1987)(quoting *28 U.S.C. § 2255*).

A motion under *§ 2255* may not serve as a substitute for direct appeal and the failure to raise an issue on direct appeal ordinarily constitutes a procedural default and precludes a defendant's ability to raise that issue for the first time in a *§ 2255* motion. *Matthews v. United States*, 114 F.3d 112, 113 (8th Cir. 1997).

None of Brown's current claims were asserted on direct appeal. *Brown,* 330 F.3d 1073.

"Ineffective assistance of appellate counsel may constitute cause and prejudice to overcome a procedural default." *Becht v. United States*, 403 F.3d 541, 545 (8th Cir. 2005) *Boysiewick v. Schriro,* 179 F.3d 616, 619 (8th Cir. 1999). To establish the ineffective assistance of counsel as cause and prejudice to excuse procedural default, Brown must show that "counsel's performance was deficient" and "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, in the context of counsel's performance in the direct appeal, Brown must establish first that his "counsel's assistance fell below an objective standard of reasonableness in that counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would use under like circumstances; and second, that the deficient performance prejudiced [his] defense." *United States v. Acty,* 77 F.3d 1054, 1059 (8th Cir. 1996) (internal quotations omitted). This "review of counsel's performance is highly deferential," *Sherron v. Norris*, 69 F.3d 285, 290 (8th Cir. 1995), and "[i]t is the defendant's burden to overcome the strong presumption that counsel's

-5-

actions constituted objectively reasonable strategy under the circumstances." *Schumacher v. Hopkins*, 83 F.3d 1034, 1037 (8th Cir. 1996).

"To show that he was prejudiced by deficient performance of counsel, [Brown] must establish that counsel's conduct rendered the result of the proceeding unreliable, and 'a necessary condition for establishing prejudice is to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Becht*, 403 F.3d at 546 (quoting *Schumaker*, 83 F.3d at 1037). "To determine whether there is a reasonable probability that the result of the proceeding would have been different, we consider" what the appellate court would have done had Brown's claims been raised on direct appeal. *Becht*, 403 F.3d at 546.

Although the United States argues that it was objectively reasonable for Brown's appellate counsel to fail to raise the claims which Brown now asserts, we proceed to evaluate whether such failure prejudiced Brown. We take this course because it is simply easier to do so. "If it is easier to dispose of an ineffectiveness claim on grounds of lack of sufficient prejudice, ... that course should be followed." *Strickland*, 466 U.S. at 697. By its very nature, this review involves a consideration of the merits of Brown's claims. *See Becht*, 403 F.3d at 546 (to determine whether there is a reasonable probability that the result of the proceeding would have been different, we consider what the appellate court would have done had the issue been raised on appeal).

Brown represented himself at trial. Except for his claim that his Sixth Amendment rights were violated and his claim that unconstitutional searches and seizures occurred, Brown failed to object on the record or otherwise note his exception to the alleged errors. Accordingly, in making a "prejudice" determination, we note that the United States Court of Appeals for the Eighth Circuit would have applied a "harmless error" standard with respect to these claims because Brown objected

AO72A
(Rev. 8/82)

or noted his exceptions. *See United States v. Mendoza-Mesa*, 421 F.3d 671, 672 (8th Cir. 2005)(where appellant makes a timely objection, appellate review is for harmless error); *Federal Rules of Criminal Procedure, Rule 52(b)*("any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded"). If an error is of constitutional magnitude, the United States is required to prove that the error "was harmless beyond a reasonable doubt." *Mendoza-Mesa*, 421 F.3d at 672. "As to errors not of constitutional magnitude, the government is required to establish that we do not have 'grave doubt' as to whether the error substantially influenced the outcome of the proceedings." *Id.*, 421 F.3d at 671-72 (quoting *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946).

Since Brown did not object or bring to this court's attention his allegation of error with respect to the balance of his claims, those claims would have been reviewed on appeal for plain error. *F.R.Cr.P., Rule 52(b)* provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." "Without an objection and a proper request for relief, the matter is waived and will receive no consideration on appeal absent plain error." *Owen v. Patton, 925 F.2d 1111, 1115 (8th Cir. 1991)*; *see also United States v. Griggs*, 431 F.3d 1110, 1114 (8th Cir. 2005)(if a defendant fails to preserve error, appellate review is for plain error rather than harmless error). "Under plain-error review, relief is not warranted unless the defendant demonstrates an error that is plain and that affects the defendant's substantial rights." *United States v. Collins*, 340 F.3d 672, 682 (8th Cir. 2003)(quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)(internal quotations and alterations omitted)). "Under plain error [review], the defendant bears the burden of persuasion to show the error affected his substantial rights." *United States v. Gianakos*, 415 F.3d 912, 923 (8th Cir. 2005). "The court then has discretion to correct a forfeited error if 'the error

AO72A
(Rev. 8/82)

seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Collins*, 340 F.3d at 682 (quoting *Olano*, 507 U.S. at 732). "A defendant's 'substantial rights are affected if the error prejudicially influenced the outcome of the district court proceedings.'" *United States v. Aiken*, 132 F.3d 432, 454 (8th Cir. 1998)(quoting *United States v. Beasley,* 102 F.3d 1440, 1452 (8th Cir. 1996), *cert. denied*, 520 U.S. 1246 (1997)).

The weight of the evidence against the defendant is an important consideration in both the "harmless error" and "plain error" review. *See United States v. Roach*, 164 F.3d 403, 411 (8th Cir. 1998)(given the weight of the evidence, admission of statements was no more than harmless error); *United States v. Miners*, 108 F.3d 967, 969 (8th Cir. 1997)("strong evidence" against defendant considered in "plain error" review).

The evidence against Brown was overwhelming: the United States Court of Appeals for the Eighth Circuit summarized the evidence against Brown as follows:

> While visiting friends in Kansas, truck driver Brown offered to take the family's ten-year-old daughter, Jane Doe, (footnote omitted) on an overnight trip to Texas while he made a delivery. The child's mother signed a note giving Jane permission to go with Brown to Dallas and return the next day. Brown and Jane left Kansas and arrived in Dallas that night. While sleeping in the truck, Jane awakened to find Brown putting his hands into her pants. Jane asked Brown to take her home. The next day, Brown left Dallas heading north but instead went to a rural campground in Arkansas, where he sexually assaulted Jane the following day. On the third day, a grocery store owner became suspicious and contacted police. Though Jane told the investigating officer she was Brown's daughter, as Brown had instructed, the officer contacted Kansas police and learned that Brown was driving a stolen truck and had kidnaped a girl. When officers arrested Brown, a distraught Jane reported that Brown had sexually assaulted her. A medical examination revealed bruises on her face and body, a vaginal tear, and semen in the crotch of her pants.

*United States v. Brown*, 330 F.3d at 1076.

Our thorough review of the trial record reveals the following. The victim was ten years of age

AO72A
(Rev. 8/82)

at the time of these crimes. (T. 851)  Her mother and step-father testified that Brown was a family acquaintance who, on Sunday, October 7, 2001, asked that the victim be allowed to travel with him in his tractor-trailer rig on a run from Hutchinson, Kansas, the victim's home, to Dallas and back. These witnesses testified that they gave permission with the understanding that the child would be returned on October 8, 2001.  No permission was given for Brown to take the child into Arkansas. (T. 204-07, 514-18)  When Brown did not return with the child on October 8, 2001, the victim's mother notified law enforcement.  (T. 522)

Brown's employer testified that after Brown made the Dallas delivery he was instructed to pick up another load and transport it to Kansas City, Kansas. (T. 408-10)  Instead, without notice to the employer and without permission, Brown dropped the trailer in Denton, Texas.  The employer reported the rig stolen. (T. 411)  The employer testified that she never gave permission for Brown to take the truck to Arkansas.  (T. 442-43)

The stolen tractor, occupied by Brown and the victim, was located on October 10, 2001, at a rural campground in Little River County, Arkansas. (T. 241-42)  Officers surrounded the vehicle and when Brown emerged, he was taken into custody. (T. 243)  Officers found the victim inside the cab. (T. 242)  She reported to officers that Brown had sexually assaulted her. (T. 243)

Upon physical examination at a hospital emergency room on October 10, 2001, the child was found to have sustained bruises and abrasions on her arms, chest and hands. (T. 297-99)  Redness and contusions were found on her genitalia. (T. 303)  The bottom opening of the vagina was torn. (T. 305, 307, 311)  All of this was consistent with sexual assault.  (T. 304, 307-08, 349)  The examining doctor testified that the injuries were sustained during the previous 36 to 48 hours. (T. 310)

AO72A
(Rev. 8/82)

A doctor who had examined the victim four days earlier, on October 6, 2001, in Hutchinson, Kansas, before her trip with Brown, testified that the child had none of these injuries at the time of that examination. (T. 536-45)

When questioned by an F.B.I. agent, Brown stated that he would tell the agent what had happened during the trip if the agent could assure that Brown would be imprisoned in a facility that had a treatment program for sex offenders. (T. 1033-35)

A stain consisting of a mixture of semen and blood was found in the crotch of the victim's jeans. (T.354, 804-24) A biologist with the Arkansas State Crime Lab revealed that "Brown's blood sample had been tested, his DNA matched that of the semen found on [the victim's] clothing, and the random probabilities of such a match are 1 in 6,369." *United Sates v. Brown*, 330 F.3d at 1076. (T. 801-24)

Finally, the child-victim gave graphic testimony recounting that she was sexually assaulted by Brown on at least three separate occasions during the trip. (T. 870, 877, 884-89, 895)

In considering each of Brown's claims, the weight and nature this evidence must be kept in mind.

**A. Sentencing error:**

Brown first asserts that his sentences violated the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)( "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt."), and *United States v. Blakely*, 542 U.S.296, 303, 124 S.Ct. 2531, 2537 (2004)(with respect to a state sentencing guidelines plan, "the statutory maximum for *Apprendi* purposes is the maximum a judge may impose based solely on the facts reflected in the jury verdict

or admitted by the defendant.")[1].

We conclude that no *Apprendi* or *Blakely* error occurred and the United States Court of Appeals for the Eighth Circuit would have agreed. Each of the statutes under which Brown was convicted provides for punishment "by imprisonment for any term of years or for life." *18 U.S.C. § 1201(a)(1)* and *18 U.S.C. § 2241(c)*. More specifically, under the elements of each charged offense, as found by the jury, sentences of up to life imprisonment were permitted. *Id.* (Jury instructions, T. 2237-38 (kidnapping) and T. 1139-40 (aggravated sexual abuse of a child)). Brown received a sentence of life imprisonment for each offense, the maximum allowed by statute. *Id.* Although the various enhancements found and applied by the court increased the guideline range, they did not alter the maximum range permitted by these statutes. "In *Apprendi,* the Supreme Court held that any fact, other than a prior conviction, that increases a penalty for a crime beyond the prescribed statutory maximum must be charged and proved beyond a reasonable doubt." *United States v. Evans*, 285 F.3d 664, 672 (8th Cir. 2002)(citing *Apprendi*, 530 U.S. at 490. "*Apprendi* does not apply to sentencing factors that increase a defendant's guideline range but do not increase the statutory maximum." Id.

**B. Speedy trial - deprivation of trial preparation time:**

Next, Brown asserts that the indictment should have been dismissed because the trial was commenced within 30 days of the date that he elected to represent himself in violation of the Speedy Trial Act, *18 U.S.C. § 3161(c)(2)*(unless the defendant consents in writing the trial shall not commence less than thirty days from the date the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se).

This claim would not have succeeded on direct appeal as no error, plain or otherwise,

---

[1]Brown states that he does not rely upon *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 756 (2005).

AO72A
(Rev. 8/82)

occurred. Brown was arraigned on December 6, 2001 (Doc. #9) and Attorney Craig Henry was appointed as Movant's attorney on that date and appeared at the arraignment. (Doc. #5 & 10) The trial began on March 18, 2002, well over thirty days from the arraignment, the date Attorney Henry first appeared in Brown's behalf after the indictment was filed.

> The 30-day provision operates to support a criminal defendant's sixth amendment right to effective assistance of counsel by assuring "that a defendant be given a reasonable time to obtain counsel and that counsel be provided a reasonable time to prepare the case." Committee on the Administration of Criminal Law of the Judicial Conference of the United States, *Guidelines to the Administration of the Speedy Trial Act of 1974, as Amended,* 106 F.R.D. 271, 278 (1984) (emphasis omitted).

*United States v. Reynolds*, 781 F.2d 135, 136 (8th Cir. 1986). The statute "clearly fixes the beginning point for the trial preparation period as the first appearance through counsel." *United States v. Rojas*, 474 U.S. 231, 234 (1985). As the statute speaks in disjunctive terms, the prescribed thirty day minimum period begins to run when the first of the specified events occurs, "the date the defendant first appears through counsel *or* expressly waives counsel and elects to proceed pro se." *18 U.S.C. § 2161(2).* That triggering event was Attorney Henry appearing in Brown's behalf at the arraignment. The fact that Brown later elected to waive counsel and proceed pro se did not restart the thirty day period mandated by *§ 3161(c)(2).*

Since this claim would have been rejected if raised on direct appeal, Brown suffered no prejudice by his appellate counsel's failure to assert the contention, and, therefore, the claim is now procedurally barred.

## C. Confrontation:

Brown asserts that his rights under the Confrontation Clause of the Sixth Amendment to the Constitution were violated because the complaining witness, a child, was permitted to testify from

-12-

another room via a closed circuit television system.  For the reasons elaborated upon below, we find that this claim would also have been rejected on direct appeal.

Prior to trial, the United States filed a motion with this court, pursuant to *18 U.S.C. § 3509(D)(1)*, asking that the child be permitted to testify from outside the courtroom via closed circuit "two-way" television.  (Doc. #41)  No response was filed by Brown.

Hearing on the motion was conducted on the first day of trial immediately before the trial commenced.  (Doc. #57)  The only witness called by the United States at the hearing was Amy Hooper, the child's therapist.  Ms. Hooper testified that she possesses a bachelor of science degree in psychology and a master's degree in community counseling.  (T. 4)  She testified that she was employed full-time at a psychiatric hospital in Texarkana, Arkansas and part-time by a physician.  (T. 4).  She had been practicing psychotherapy for four and one-half years working only with children. She had counseled with thirty to forty children during her years of practice. She worked solely with children at her part-time employment.  She testified that she had received required continuing education in her field, and consulted with a supervisor who specializes in treating children who have been sexually abused.  She stated that she has previously testified as an expert witness.

After hearing testimony as to Ms. Hooper's qualifications and experience, this court granted the government's motion that she be allowed to testify as an expert witness in the field of counseling. (T. 7)

Ms. Hooper testified that she had counseled the child-victim weekly since October, 2001, or 18 separate occasions for a total of 18 hours.  She last saw the child on March 13, 2001.  She testified that it would be "detrimental" to the child to testify in court, facing Brown. (T. 7)  She stated that the child was "scared and nervous" about testifying with Brown in the courtroom and she quoted the child

as saying that she was "worried" that "she would say something he [Brown] wouldn't like and then he would" slap or punch the child because "that is what he did in the truck when [she] screamed." The witness testified that the child would be able to testify "as long as her contact with the alleged perpetrator is limited," and that the child's testimony would be "more accurate if her contact" was limited. (T. 8) Further, Ms. Hooper testified that because Brown was representing himself and would be directly questioning the child, the child would be "so emotionally distraught," she did not know "if you could get any meaningful testimony from her from her shaking and being tearful and really scared." (T. 9)

Ms. Hooper further testified that it would be easier for the child to recount what happened and there would be less chance of retraumatizing the child, if the child was permitted to testify from an off-site location by closed circuit television. (T. 9)

In conclusion, Ms. Hooper stated that the child would be unable to testify due to fear if she were to see Brown in the courtroom and there would be substantial likelihood that the child would suffer emotional trauma if she saw Brown while she testified in open court. (T. 10)

On cross-examination, Ms. Hooper testified that she had attempted to comfort the child and inform her that there would be law enforcement personnel in the courtroom who would prevent any kind of physical contact with Brown. Hooper stated that the "less contact that she has, the less direct contact the less our chances of retraumatizing her." (T. 11)

Ms. Hooper testified that it was her understanding that, while testifying, the child would hear Brown's voice but would not see his face. (T. 12)

Ms. Hooper stated that the child talked about being scared and nervous and asked if Brown would be shackled and guarded. (T. 13)

-14-

Ms. Hooper stated that having direct contact with Brown would cause the child severe emotional harm, but it could be therapeutic for her to have her say about what happened to her. (T. 13) She further stated that the "child has expressly informed [her] that the child is afraid to see the perpetrator and could not testify if she were to see him in the courtroom." (T. 14)

After hearing this testimony, the court granted the government's motion. (T. 17) Prior to the child's testimony, the defendant objected, on record, to the procedure on Sixth Amendment grounds. (T. 840)

In *Maryland v. Craig*, 497 U.S. 836, 853 (1990), the Supreme Court concluded that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his accusers in court." *Id.* In order for child testimony to be presented without face-to-face confrontation, the trial court must, in a case-specific manner, hear evidence and determine whether a system is necessary to protect the welfare of the child witness. *Id.* at 855. The trial court must find that: "it is the presence of the defendant" rather than the courtroom generally, that would traumatize the child witness; and, the trial court must find that the emotional distress suffered by the child "is more than *de minimus, i.e.,* more than 'mere nervousness or excitement or some reluctance to testify.'" *Id.* at 856 (quoting *Widermuth v. State*, 310 Md. 496, 524 (1987).

Clearly, this court followed the procedure mandated in *Maryland v. Craig*. In a "case specific manner," this court conducted a pretrial hearing on the issue and heard the testimony of the child's psychological counselor. The counselor testified, without equivocation, that it would be the presence of the defendant in the courtroom with the child which would traumatize the child witness and that such circumstances would not only frighten the child but would cause the child severe emotional

-15-

harm. (T. 9-14) Accordingly, the elements justifying the child's testifying via closed circuit television are present and the procedure utilized was constitutional.

Brown points out that a two-way closed circuit television system was not utilized in this case. Indeed, the government's motion requested authorization for a "two-way" system to be used. (Doc. #41) Prior to the child's testimony, the court stated that it had "granted this two-way television," and the Assistant United States Attorney stated that an FBI technician was "setting up the two-way circuitry television." (T. 839) Later, the court stated that it had "ruled as a matter of law that questioning by the defendant, Mr. Brown, should occur not face-to-face but through a closed circuit two-way TV network." (T. 846) However, at the hearing on the pending *§ 2255* motion, the United States stipulated that a two-way television system was not actually used. Under the system used, the child testified from a separate room outside of the presence of the defendant, judge, and jury. The defendant, the judge, and the jury could see the child as she testified via a television monitor, and they could hear her voice over a speaker system. While the child could hear the questions asked of her by the Assistant United States Attorney, the court, and the defendant, she did not have the ability to see the persons inside the courtroom because a television monitor was not provided for her use. (*§ 2255* Hrg., Vol. II, T. 344)

As found above, the manner in which the child witness's testimony was presented did not constitute constitutional error. A one-way closed circuit system was in fact used in *Maryland v. Craig*, and was found to satisfy the requirements of the Confrontation Clause. *Craig*, 497 U.S. at 851-52 (use of a "one-way closed circuit television procedure, where necessary to further an important state interest, does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause.")

-16-

Brown has not contended that Jane Doe was not competent to testify under oath and, indeed, the court questioned her as to her competency prior to her being sworn. (T. 848-49) Further, the defendant had full opportunity for contemporaneous cross-examination, and the judge, jury, and defendant were able to view the demeanor of the witness as she testified via video monitor. *Id.* at 851 (one-way video system preserves "all of the elements of the confrontation right: The child witness must be competent to testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies.").

Accordingly, we find that had this issue been presented to the United States Court of Appeals for the Eighth Circuit, it would have concluded that the procedure used was constitutional.

The procedure used did, however, fail to comply with the requirements of *18 U.S.C. § 3509(D)(1)*. This statute was enacted after *Maryland v. Craig* was decided. The statute requires that a "2-way closed circuit television" be used. *18 U.S.C. § 3509(D)(1)*. The statute requires that the system used "relay into the room in which the child is testifying the defendant's image, and the voice of the judge." *Id.* Here, it is undisputed that only the voice and not the image of the defendant was relayed into the court room in which the child witness was testifying.

Otherwise, the procedure used was in compliance with the statute. The court supported its ruling with findings on the record, concluding that the "child is unable to testify because of fear" and there "is a substantial likelihood, established by expert testimony, that the child would suffer emotional trauma from testifying." *18 U.S.C. § 3509(B)(i - iv)* (the court may order televised child testimony where *any* of the listed factors are present).

While Brown did not object to the procedure on statutory grounds, we conclude that the

-17-

appellate court would have found that any violation of statute, as to the manner in which the victim's testimony was presented, had not "'prejudicially influenced the outcome of the district court proceedings,'" *United States v. Aiken*, 132 F.3d at 454(quoting *United States v. Beasley*, 102 F.3d at 1452). Therefore, Brown's substantial rights were not affected, and plain error did not occur. *F.R.Cr.P., Rule 52(b)*.

### E. Speedy Trial - delay in indictment:

Next, Brown alleges that his convictions were obtained in violation of the "Speedy Trial Act," *18 U.S.C. § 3161(b)*, in that he was not indicted within 30 days of his arrest. The statute provides:

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges. *If an individual has been charged with a felony in a district in which no grand jury has been in session during such thirty-day period, the period of time for filing of the indictment shall be extended an additional thirty days*.

*18 U,S,C. § 3161(b)*(emphasis supplied). The sanction for the violation of this provision is dismissal of the charge. *See 18 U.S.C. § 3162(a)(1)*.

Section 3162(a)(1), "... requires not only that the defendant be arrested, but that the arrest be based on a charge that is contained in a complaint filed against the defendant." *United States v. Ray*, 768 F.2d 991, 996 (8th Cir. 1985); *see also United States v. Piggie*, 316 F.3d 789, 795 (8th Cir. 2003) (for Speedy Trial Purposes, the "triggering event is an arrest in connection with the crime for which the defendant is tried"); *United States v. Wilson*, 102 F.3d 968, 972 (8th Cir. 1996) ("The right to a speedy trial on a charge is triggered by arrest only where the arrest is the beginning of continuing restraints on defendant's liberty imposed in connection with the formal charge on which the defendant is eventually tried.") (internal quotation and citation omitted); *United States v. Davis*, 785 F.2d 610,

-18-

613 (8th Cir. 1986) ("an arrest under § 3161(b) means a formal arrest, such as when a complaint, information or indictment has been filed") (citations omitted).

Brown was arrested under a criminal complaint on October 12, 2001. (Doc. #2) The complaint alleged that he had committed the crimes of transporting a minor female, in interstate commerce, for the purpose of engaging in a sexual act, in violation of *18 U.S.C. § 2423(b).* (Doc. #1) The indictment was filed on November 29, 2001 (Doc. #8), 48 days after the arrest. However, at the *§ 2255* hearing, Assistant United States Attorney Kyra Jenner testified, without contradiction, that the preceding grand jury for this district met on September 28, 2001, a date before Brown's arrest and before the subject crimes had been committed, and that the next grand jury did not meet until November 29, 2001. (*§ 2255* hrg., T. 260-61).

This court was obviously aware of the fact that a grand jury did not meet within thirty days after Brown's arrest. Further, Brown never objected to the delay in the filing of the indictment. Even if he had objected, this court would have found the indictment to have been timely filed because of the fact that no grand jury met within the initial thirty day period and the indictment was filed within the extension provided for in *§ 3161(b).*

Since the indictment was timely filed, no error occurred.

### E.  Double Jeopardy:

Brown alleges that two counts with which he was charged consisted of the same elements in violation of the Double Jeopardy Clause. *U.S. Const. Amend. V.*

> Under the Fifth Amendment, a defendant is protected from being subject to double jeopardy. *Sattazahn v. Pennsylvania,* 537 U.S. 101, 106, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003). Where each offense requires proof of a different element, there is not a double jeopardy problem. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (holding that convictions for separate counts arising

-19-

out of the same narcotics sale did not constitute double jeopardy because each count required proof of an additional fact that the other did not).

*United States v. Carpenter*, 422 F.3d 738, 747 (8th Cir. 2005). Brown was convicted of kidnapping in violation of *18 U.S.C. § 1201(a)(1)* and aggravated sexual abuse of a child in violation of *18 U.S.C. § 2241(c)*. (Doc. #8) He asserts that these offenses required proof of the same elements. (Doc. #106, 115, 121, 122, 171)

Although, on direct appeal, Brown argued that the verdict form constructively amended the aggravated sexual abuse count, he did not assert a "double jeopardy" claim. *Brown*, 330, F.3d at 1076. Such a claim, if asserted, would have been rejected.

The elements of the offense of kidnapping under *18 U.S.C. § 1201(a)(1)* are: "(1) that the defendant knowingly and willfully seized, confined, kidnapped, abducted or carried away a person as charged; (2) that the defendant held such a person from the kidnapping; and (3) that such a person was thereafter transported in interstate commerce while so confined, or kidnapped." *United States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2003); *see also United States v. McCabe*, 812 F.2d 1060, 1061 (8th Cir. 1987). This court instructed the jury as follows:

> ... the government must prove the following three (3) essential elements beyond a reasonable doubt: *One*: The Defendant, Brian Brown, knowingly and willfully seized, confined, kidnaped, abducted, or carried away the person named in the indictment; *Two*: The person named in the indictment was thereafter transported in interstate commerce while so seized, confined, kidnaped, or abducted; and *Three*: The Defendant Brian Brown held the person named in the indictment for ransom, reward or other benefit or reason.

(T. 1137-38)

*18 U.S.C. § 2241(c)* provides, in pertinent part:

> Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years ... shall be fined under this title, imprisoned for

AO72A
(Rev. 8/82)

any term of years or life, or both....

Clearly, each offense required proof of at least one different element. For example, *§ 2241(c)* requires proof of intent to engage in a sexual act with a person under the age of twelve, while kidnapping under *§ 1201(a)(1),* does not require proof of such elements.

Accordingly, even if asserted on appeal, this claim would have failed.

**F. Search and Seizure:**

Brown asserts that items of evidence should have been suppressed. Specifically, he asserts that items of evidence removed from the cab of the vehicle at the time of Brown's arrest and removed later pursuant to Brown's written consent should have been suppressed. (Doc. #106, 115, 121) On March 15, 2001, three days before trial, Brown filed a pro se motion to suppress. (Doc. #53) Although the motion to suppress was filed long after the deadline for the filing of such motions established in this court's pretrial order (Doc. #13), the court considered the motion and conducted a hearing, outside of the presence of the jury, on the first day of trial. (Tr. 240-89) This court denied the motion. (T. 289)

Brown asserted that items were taken from the cab of the truck at the time of his arrest by officers, or that officers permitted the child victim to reenter the cab of the truck, retrieve items and turn them over to officers. (Doc. #53) At the suppression hearing, the Sheriff Danny Russell of Little River County, Arkansas, testified that he was dispatched to "Wilton Landing" in rural Little River County to investigate the report of a stolen truck and the reported abduction of a child. Officers surrounded the vehicle and when Brown emerged he was arrested. The victim was found in the cab of the truck. According to the Sheriff, the child was permitted to remove certain items from the cab and give them to officers. These items included: a pornographic video and book, a cassette tape and

-21-

handwritten notes. (T. 244)

Subsequently, according to Sheriff Russell, Brown told law enforcement officers that there were notes and an audio cassette that would clear up everything. (T. 245) On October 11, 2001, Brown executed a consent to the search of the truck. (T. 246) Pursuant to Brown's written consent, the vehicle was searched at the garage where it had been towed. (T. 262) During the search additional items were seized including: sheets, a pillowcase, cameras and a roll of duct tape. (T. 248)

The general rule is that "warrantless searches are presumptively unreasonable," *Horton v. California*, 496 U.S. 128, 133 (1990), "subject only to a few specifically established and well-delineated exceptions." *United States v. Ross* 456 U.S. 798, 824-25 (1982).

At the suppression hearing, Sheriff Russell testified that on October 10, 2001, he and Corporal Ronnie Kennedy were dispatched to "Wilton Landing" in Little River County, "in reference to a stolen vehicle that possibly had an abducted child in it." (T. 241) Upon arriving at the location Sheriff Russell found a Peterbilt tractor, gray in color with the company name "Nexus" on the door. Sheriff Russell stated that the vehicle had been reported stolen and information was provided that there was an abducted child in the vehicle. (T. 241-42, 256) The officers surrounded the vehicle, identified themselves as law enforcement officers, and called for the occupants to come out with their hands up. Brown emerged followed by the victim. Brown was arrested. (T. 242)

Sheriff Russell testified that the child was extremely upset and crying. She told the officers that Brown "had been molesting her ... while in his vehicle." (Tr. 243)

The Sheriff asked Brown for identification. Brown gave the Sheriff permission to enter the cab of the tractor and get Brown's billfold. The billfold had Brown's identification in it. (T. 243-4) The child asked the officers if she could "get her personal stuff" out of the cab. The Sheriff climbed

-22-

up on the driver's side and a deputy climbed up on the passenger side. The child reentered the vehicle and handed items out to the officers, specifically: a pornographic video tape, a book containing photographs of nude females, small pieces of paper, and a cassette tape. (T. 245) The Sheriff did not have the permission of Brown or the owner of the vehicle to enter it. (T. 257)

According to the Sheriff, at the Sheriff's office, Brown retrieved a three page handwritten note from his billfold and gave it to the officers, along with a cassette tape, insisting that they would clear everything up. (T. 245-46)

On October 11, 2001, Brown signed an Arkansas State Police Consent to Search Form. (U.S. Ex. #66) Sheriff Russell then assisted in searching the tractor pursuant to the consent to search. (T. 246-47) The search was conducted at the garage where the vehicle had been towed. (T. 262) Twelve items were seized. These items are identified as U.S. Exhibits #1-13.

According to Sheriff Russell, Brown never indicated that he had withdrawn his consent to search. (T. 253)

FBI Special Agent Randall Harris testified that he received a telephone call from the Wichita, Kansas office of the FBI advising that a vehicle from Kansas had been reported stolen and that a child had been reported abducted. It was reported that the vehicle had been recovered in Little River County, Arkansas. Harris spoke with the owner of the truck, Lorraine Nwakpuda, owner of Nexus Trucking, who identified herself as Brown's employer. She told Harris that the truck was stolen. (T. 265)

Harris spoke with Brown in Ashdown, Arkansas, on October 10, 2001. He also interviewed the child. (T. 265) On October 11, 2001, Brown sent word to Harris that he wanted to speak with him again, and Brown signed a consent to search form with respect to the truck. (T. 268) There was

-23-

no further discussion with Brown about the search. (T. 269)

Hayes McWhirter, Special Agent, Arkansas State Police, testified that he prepared the consent to search form (U.S. Ex. #66) and read it to Brown. The consent was never revoked. (T. 282-83) The form was executed on October 11, 2001, and the search took place at 4:30 p.m. that same day. (T. 283-88) The inventory of items seized pursuant to that search is dated October 12, 2001. (T.283)

Brown cannot challenge the search and seizure of items from the Peterbilt tractor on October 10, 2001, at the time of his arrest, whether such search and seizure was conducted by the arresting officers or by the child/victim with the assent of the officers, because he did not have a legitimate expectation of privacy in the stolen vehicle. *United States v. McCaster,* 193 F.3d 930, 933 (8th Cir. 1999) (When a defendant asserts Fourth Amendment protections he "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable....")

At the suppression hearing, Sheriff Russell testified that he investigated the parked truck because it had been reported stolen. (T. 244) Special Agent Harris testified that he had spoken with the owner of the truck, Brown's employer, who reported the vehicle stolen and inquired about prosecution of Brown for the theft. (T. 265) Fourth Amendment rights are personal and may not be vicariously asserted. *Alderman v. United States,* 394 U.S. 165, 174 (1969); *Minnesota v. Carter,* 525 U.S. 83, 88 (1998). The defendant must be "able to show the violation of his (and not someone else's) Fourth Amendment rights'" *Id.* To show a Fourth Amendment violation, a defendant must show he had an actual, subjective expectation of privacy in an area in which society is prepared to recognize as reasonable. *Katz v. United States,* 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

Brown did not have a reasonable expectation of privacy in the vehicle which belonged to his

-24-

employer and which he had just stolen. "Because expectations of privacy derive in part from the right to exclude others from the property in question, lawful possession is an important consideration in determining whether a defendant had a legitimate expectation in the area searched." *United States v. Lyons,* 992 F.2d 1029, 1031 (10th Cir. 1993).

Since Brown had no expectation of privacy with respect to the truck, he cannot complain about the search of the same or the seizure of evidence found therein. *See United States v. Sholola*, 124 F.3d 803, 816 n. 14 (7th Cir. 1997)(person present in stolen car has no expectation of privacy therein); *United States v. Lanford*, 838 F.2d 1351, 1353 (5th Cir. 1988)(driver of stolen automobile lacked legitimate expectation of privacy therein and therefore lacked standing to challenge search of the vehicle).

Additionally, the searches were proper under the "automobile exception." One exception to the general rule prohibiting warrantless searches is the so-called "automobile exception." *See generally Carroll v. United States,* 267 U.S. 132, 158-59, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (creating the automobile exception). "The warrantless search of a vehicle is constitutional pursuant to the 'automobile exception' to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'" *United States v. Castaneda*, No. 05-1010, 2006 WL 435603 (8th Cir. Feb. 24, 2006)(citing *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003)). Since Brown was arrested for theft of the truck and the abduction of the child officers were permitted to search the cab for evidence of the crimes. Further, under the automobile exception, "the vehicle need not be immediately searched." *Castaneda*, ___ F.3d at ___ (citing *Wells*, 347 F.3d at 287-88)("When police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct

AO72A
(Rev. 8/82)

a warrantless search of the vehicle, even after it has been impounded and is in police custody.").

Finally, the October 11, 2001 search was accomplished pursuant to Brown's written consent. As noted above, officers testified that Brown voluntarily executed a written consent to search on October 11, 2001. "A warrantless search does not violate the Fourth Amendment if knowing and voluntary consent was given." *United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005). "The government bears the burden of proving voluntary consent by a preponderance of the evidence." *Id.*

"To determine whether consent to search is voluntary, courts consider the totality of the circumstances, including characteristics of the accused and details of the interrogation, to decide whether the consent was the product of a free and unconstrained choice or the product of duress or coercion, express or implied." *United States v. Luna*, 368 F.3d 876, 878 (8th Cir. 2004). Further, "[l]aw enforcement officers may ask a person for consent to search or other types of cooperation without violating the Fourth Amendment as long as they do not induce cooperation by coercive means." *Id.* at 879; *United States v. Yang,* 345 F.3d 650, 654 (8th Cir. 2003). "[T]he time it takes for an officer to find out if consent will be given, cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances." *Id.*

Certainly, if it had been asked to consider the matter, the Court of Appeals would have affirmed this court's conclusion that the consent was voluntarily given, and the appellate court would have found the searches and seizures otherwise constitutional.

**G. *Brady* Claim:**

Brown contends that the United States failed to disclose exculpatory evidence to him prior to trial, in violation of its obligation to do so as set forth under *Brady v. Maryland*, 373 U.S. 83 (1963).

AO72A
(Rev. 8/82)

To establish a *Brady* violation, a defendant must show that the government suppressed exculpatory evidence that was material either to guilt or punishment. *United States v. Ryan*, 153 F.3d 708, 711 (8th Cir. 1998). Evidence is material under *Brady* "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)(quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 490 (1985)(opinion of Blackmun, J.). "The critical question, however, is whether the defendant received a trial resulting in a verdict worthy of confidence. *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555.

*United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005). Further, "[u]nder the rule in our circuit *Brady* does not require pretrial disclosure, and due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial." *Id.*

At hearing, Brown identified the following as evidence that was wrongfully withheld from him:

    a. evidence of prior sexual contact between the victim and her brother, Jeff Rogers;

    b. evidence of prior sexual contact between the victim and a 15 year old boy in Alabama;

    c. evidence with respect to credit card telephone calls from Brown to the victim's family;

    d. a second letter from the victim's step-father to Brown giving instructions as to what to do in the event of an emergency during his trip with the victim; and,

    e. items including a briefcase, audio cassettes, bedding and items contained in a safe, all located in the Peterbilt tractor, at the time of Brown's arrest, which were never produced or accounted for by the United States.

(T. 54-64)

At hearing on the pending *§ 2255* motion, Sergeant Jodie Holmes of the Hutchinson, Kansas Police Department testified that his department had investigated a series of incidents of alleged sexual molestation of the victim in this case as follows: an allegation of inappropriate touching by the

-27-

child's biological father in 1995; inappropriate touching of the victim by a fourteen year old male in 1997; abuse of the victim and her brothers by a twelve year old boy in May 1997 and July 1998; inappropriate touching of the victim by a seven year old boy in September, 2001; and, a nonsexual "brother-sister type altercation" between the victim and her brother. (*§ 2255* Hearing, Volume I, T. 228-34)

Assistant United States Attorney Jenner testified that the United States did not withhold exculpatory evidence from Brown and that she was not aware of a possible sexual assault on the victim by the victim's brother. She testified that the child testified at trial about an incident occurring in Alabama some years before Brown's arrest. Ms. Jenner further testified that she learned, on the morning of trial, that Brown, who was proceeding pro se with standby counsel, had not received discovery materials which the United States had previously faxed to him, and the United States presented an "extra copy" to Brown in chambers before the trial began. (*§ 2255* Hrg. Vol. I, T. 235-38)

On March 11, 2002, this court ordered that Brown be moved from the Bi-State Detention Center to the FCI Texarkana so that he could have access to law books and other legal materials with which to prepare for trial. The move occurred on March 11, 2002. (Doc. #45 ) Although it had notice of the move, the United States continued to fax materials to the Bi-State facility. The United States also provided discovery materials to Brown's standby counsel, Steve Harrelson. (T. 21, 22-25).

This error by the United States was discovered on the morning of the first day of trial when Brown complained that he had not been provided copies of proposed government exhibits and other discovery materials. The United States, in open court, then provided to Brown copies of the materials it had attempted to previously deliver to him. (T. 21-25, 83-88, 92-95, 290)

AO72A
(Rev. 8/82)

We find that Brown has not shown that the United States "suppressed" exculpatory evidence. The United States disclosed to Brown evidence that it intended to introduce during the trial. Although the United States mistakenly attempted to deliver much of this material to Brown at the Bi-State Detention Center after he had been transferred to the FCI, it delivered the material, prior to trial, to Brown's stand-by counsel. When the delivery error was discovered on the first day of trial, but prior to testimony beginning, the United States delivered a copy of the material to Brown in open court.

Brown has not proven that an incident of sexual molestation of the victim by her brother occurred or that evidence of an incident in Alabama years previously would have been exculpatory. Brown has not shown that the credit card data existed or that it would have been exculpatory. Likewise, Brown has not proven that items seized by law enforcement officers from the truck were "suppressed" or that any such items would have been exculpatory. *United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996)(*Brady* does not require the government to disclose inculpatory evidence); *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001)(no *Brady* violation where: defendant has access to evidence through other channels; or, where evidence is cumulative).

This claim is without merit.

**H.** *18 U.S.C. § 1201(g)(1)(B)(ii)(vii)*:

Brown asserts that the provisions of *18 U.S.C. § 1201(g)(1)(B)(ii)(VII)* "prohibits the prosecution of someone on kidnapping charges if the person is an 'individual having legal custody.'" (Doc. #115) At hearing, he argued that he had legal custody of the child-victim because he "was given the responsibility to take the minor to Texas and back." (T. 79) He asserted that the note written by the child's stepfather giving emergency instructions would have been evidence of such "legal custody."

-29-

This claim is without merit and the United States Court of Appeals for the Eighth Circuit would have so concluded. The provision cited by Brown sets a minimum term of imprisonment for certain persons convicted of kidnapping. A defendant who had "legal custody" of his child kidnap victim is not subject to such a minimum sentence. *18 U.S.C. § 1201(g)(1)(ii)(VII)*(if the victim of an offense under this section has not attained the age of eighteen and the offender has attained the age of eighteen and is not an individual having legal custody of the victim, the sentence under this section shall include a term of imprisonment of at least 20 years). The cited provision does not impact upon the elements of kidnapping itself.

Since Brown received a life sentence for his kidnapping conviction, the fact that he would not have been subject to a minimum sentence is irrelevant. Finally, both the victim's mother and her step-father testified that Brown's permission to have the victim in his custody ended on October 8, 2001, the date that he was to have returned with her from the Dallas. (T. 204-07, 514-18) They explained that any "notes" provided to Brown were not intended to allow Brown to retain physical custody and control of the child beyond October 9, 2001. (T. 205, 514-18)

**I. Ineffective Assistance:**

After March 8, 2002, pursuant to his request, Brown proceeded without counsel. (Doc. #42) Brown has not identified any respect in which he received the ineffective assistance of counsel during the time period he was represented by counsel.

Further, as discussed herein, Brown was not prejudiced by any failure of his appellate counsel to assert, on appeal, the claims now asserted by Brown in this *§ 2255* proceeding.

**J. DNA Evidence:**

Finally, Brown asserts that testimony as to DNA testing and test results was improperly

-30-

admitted into evidence during the government's case in chief. Specifically, he claims that the "Arkansas State Crime Lab DNA tests themselves were done improperly based on the certification of those tests by Michael Nowicki ... who is the person that signed off on the test;" (T. 72-73), and, the DNA testing protocol itself was unreliable because it is not a "direct test" but, instead, provided only probabilities. (T. 74)

At trial Melissa Myhand, a biologist in the Forensic Biology Section of the Arkansas State Crime Lab, testified. (T. 804-24) She testified that the crime lab received: a known blood sample from the victim, a known blood sample from Brown, the rape kit collected at Wadley Hospital during the examination of the victim, the victim's blue jeans, a flat sheet, a fitted sheet and a pillow case. (T. 806) She stated that no semen or blood was found in swabs contained in the rape kit. (T. 809) Blood was found on the flat sheet, the fitted sheet and the pillow case. (T. 809, 811) A stain consisting of a mixture of semen and blood was found in the crotch of the victim's blue jeans. (T. 812, 821) A mixture of blood from more than one person was found on the fitted sheet. (T. 819) The witness testified that DNA testing revealed that DNA from the blue jeans and the fitted sheet came from more than one individual and the victim and Brown could not be excluded as the donors. (T. 818, 820, 821) Further, she testified that "the random probabilities of such a match are 1 in 6,369." *Brown*, 330 F.3d at 1076. (T. 820)

The biologist testified that generally accepted technology and scientific methods and guidelines were used in this testing. (T. 806-07, 816) She stated that the policies and procedures of the Arkansas State Crime Lab were followed in this case. (T. 817)

Brown objected to the testimony on hearsay grounds in that the witness relied, in her testimony, upon tests performed by others at the crime lab. (T. 814) The court correctly overruled

AO72A
(Rev. 8/82)

the objection relying upon *Federal Rules of Evidence, Rule 703*:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted...

*F.R.E., Rule 703*.  "Rule 703 permits an expert to 'rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field.'" *Sosna v. Binnington*, 321 F.3d 742, 746 (8th Cir. 2003)(quoting *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.,* 125 F.3d 1176, 1182 (8th Cir.1 997) (citing *Fed.R.Evid. 703*)).

The United States Court of Appeals for the Eighth Circuit reviews "'a district court's admission of DNA evidence for an abuse of discretion.'" *United States v. Gipson*, 383 F.3d 689, 696 (8th Cir. 2004)(quoting *United States v. Johnson,* 56 F.3d 947, 952 (8th Cir.1995)).  Brown has offered no evidence calling into doubt the authenticity of the test results relied upon by Ms. Myhand, and his claim constitutes nothing more than an unsubstantiated and speculative allegation.

Brown testified that the DNA testimony was inadmissible because the biologist was able to testify only in terms of probabilities and was unable to say that "this is [Brown's] DNA and this is her DNA." (T. 74)

Again Brown provides no evidence or authorities in support of his contention.  Further, this court was permitted take judicial notice of the reliability of DNA profiling. *United States v. Martinez*, 3 F.3d 1191, 1197 (8th Cir. 1993)(future courts can take judicial notice of "the general theory and techniques of DNA profiling").  Accordingly, DNA testimony in terms of statistical probabilities was properly admitted and Brown's DNA evidence claims are without merit.

AO72A
(Rev. 8/82)

**Conclusion:**

As explained above, all of Brown's claims are procedurally barred and are also substantively without merit. It is recommended that Brown's claim for relief pursuant to *28 U.S.C. § 2255* be denied.

**The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 14th day of March 2006.

*/s/ Bobby E. Shepherd*
HON. BOBBY E. SHEPHERD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)